842 F.2d 331
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Jose G. GALVAN, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee,
 No. 87-5360.
 United States Court of Appeals, Sixth Circuit.
 March 17, 1988.
 
 Before RALPH B. GUY Jr., and BOGGS, Circuit Judges and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 The claimant filed applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) alleging that he became permanently disabled in February, 1976, because of a dislocated hip and pain radiating from his hip, back, and neck. The Secretary denied the claimant's application initially and upon reconsideration reasoning that the claimant was not disabled, as of September, 1978, when his disability insured status expired and that he retained the residual functional capacity to perform medium level sedentary work. On appeal, the district court remanded the case back to the Secretary, pursuant to section 5 of the Social Security Disability Reform Act of 1984, to determine whether the claimant's mental or emotional impairments precluded him from engaging in a full range of sedentary activity. Upon remand, the Secretary's final decision denied the claimant's applications reasoning that the claimant had no exertional impairments or nonexertional limitations that precluded him from performing his prior job as a cook. On appeal, the district court referred the case to a magistrate. Adopting the magistrate's report and recommendation, the district court affirmed the Secretary's final decision denying the claimant benefits. For the following reasons, we affirm the district court's judgment.
 
 I.
 
 2
 The claimant, Jose G. Galvan, worked primarily as a cook for over twenty years and initially injured his left hip in February, 1976, when a pressure cooker lid fell on him. Galvan complicated his injury a few days later when he fell while mounting a horse. The claimant alleges that, as a consequence of his injury and the resultant disabling pain in his hip, lower back, and neck, he was unable to continue to work. Galvan's daily activities include watching television, listening to the radio, helping with housework, driving short distances, attending church on a regular basis, and exercising each day by walking at least one-half mile. Galvan also currently assists in the family restaurant several hours each day by giving cooking lessons and participating in business meetings. The claimant has not obtained regular medical treatment for his injury and resultant pain since 1978, and uses only over-the-counter drugs for the pain. The medical evidence of record is extensive and consists of reports authored by numerous physicians and psychologists, including claimant's treating orthopedic surgeon (Dr. Morgan), two neurosurgeons (Drs. Hunter and Angelucci), a consultative orthopedic surgeon (Dr. Sajadi), two psychiatrists (Drs. Gebrow and Ruth), two clinical psychologists (Mary Allen and Dr. Grenthner), and a consultative psychologist (Dr. Marx).
 
 
 3
 Dr. Morgan initially examined the claimant's hip injury in February, 1976. X-rays taken at the time showed Galvan suffered from a dislocation of the femoral head out of the acetabulum and a triangular chip fracture of the upper border of the acetabulum. Dr. Morgan placed Galvan in traction and recommended that he begin physical therapy exercises at home. Dr. Morgan examined Galvan a few months later and diagnosed him as suffering from degenerative arthritis and aseptic necrosis of the femoral head secondary to the dislocation. While he considered Galvan disabled at that time for employment purposes, based upon his injuries, he stated that the claimant could walk or stand from two to three hours. He further stated that the claimant should not have been suffering from the pain he alleged while sitting. Subsequent x-rays revealed that the condition of Galvan's hip had greatly improved. Thereafter, based upon further examinations and more recent x-rays, Dr. Morgan urged the claimant to return to work. However, Galvan asserted that the pain in his hip, neck, and back prevented him from returning to work.
 
 
 4
 In June, 1977, the claimant began seeing Dr. Hunter for treatment of the pain in his lower back and left hip. Dr. Hunter, who examined the claimant on numerous occasions thereafter, diagnosed him as suffering from a herniated intervertebral disc between the fifth lumbar and the first sacral vertebrae and a herniated intervertebral disc in the neck between the fifth and sixth vertebrae. X-rays revealed slight straightening of the cervical lordotic curvature indicating moderate muscle spasms, and slight curvature of the spine. Dr. Hunter concluded that the claimant was unable to perform any substantial gainful employment. In a subsequent examination in 1978, Dr. Hunter noted that the claimant's condition greatly improved and prescribed Soma Compound and Talwin for his pain.
 
 
 5
 Dr. Angelucci performed a consultative examination of claimant in March, 1978. Dr. Angelucci reported that the claimant complained of constant pain in his left hip radiating into his lower back and upward to his neck. Upon examination, Dr. Angelucci noted that Galvan's neck and upper extremities were without masses, spasms, tenderness, or limitations of motion. The claimant's motor function was normal. X-rays of the cervical spine, lumbosacral spine, and left hip were normal. Dr. Angelucci concluded that Galvan had a negative neurological, neck, and low back examination. Additionally, based upon a physical capacity evaluation, Dr. Angelucci concluded that Galvan could sit, stand, or walk for up to eight hours and could lift as much as twenty-one to fifty pounds. Dr. Angelucci noted that the claimant's only restrictions were his limited ability to use his left foot for repetitive movement.
 
 
 6
 At the request of claimant's attorney, Dr. Gebrow performed a psychiatric examination of the claimant in March, 1978. Dr. Gebrow noted that the claimant did not suffer from acute distress and was well oriented to time, place, and situation. Dr. Gebrow observed that the claimant was appropriately dressed and suffered no bizarre thought patterns. Based upon his examination and the results of the Minnesota Multiphasic Personality Inventory (MMPI), Dr. Gebrow diagnosed the claimant as suffering from a depressive neurosis of moderate severity and a conversion reaction. However, Dr. Gebrow noted that there was no impairment of the claimant's ability to relate to other people, and only a moderate restriction on his daily activities. When the district court remanded the case for consideration of the claimant's psychological impairments, additional physicians, psychiatrists, and psychologists examined the claimant.
 
 
 7
 Clinical psychologists' Mary Allen and Dr. Grenthner conducted numerous psychological examinations of the claimant in February, 1986. On the Wechsler Adult Intelligence Scale, the claimant had a verbal I.Q. of seventy-nine, a performance I.Q. of seventy-eight, and a full scale I.Q. of seventy-eight. On the wide-range achievement test, the claimant read and performed mathematical skills at a third-grade level. On a medical assessment test, the claimant exhibited a good ability to deal with the public, follow work-related rules, and function independently. Mary Allen and Dr. Grenthner concluded that the claimant did not suffer from emotional or psychological problems. While he was functioning on a borderline intellectual range, the claimant did not exhibit severe cognitive or intellectual difficulties.
 
 
 8
 Dr. Sajadi performed a consultative examination of the claimant in February, 1986, reporting that the claimant complained of persistent pain in his left hip, neck, and back. Upon physical examination, Dr. Sajadi noted that the claimant's gait was normal, that he was able to walk on the tips of his toes and on his heels, and that he could squat without any difficulty. A cervical spine examination revealed that the claimant had a normal range of motion and no masses or spasms. The claimant's range of motion in his back and upper extremities was normal. While the range of motion in the claimant's left hip was slightly limited, x-rays of the hip showed no signs of necrosis, and demonstrated that the femoral head was well-situated in the acetabulum. Dr. Sajadi diagnosed status post-traumatic fracture dislocation of the left hip, and degenerative disc disease at L5/S1. Additionally, Dr. Sajadi completed a medical assessment of the claimant's ability to do work-related activity. He prescribed no limitations on the claimant's ability to sit, lift, stand, carry, or walk.
 
 
 9
 Dr. Ruth conducted a consultative psychiatric examination of the claimant in March, 1986. During the evaluation, the claimant denied any significant psychiatric problems. His wife concurred that the claimant had no significant emotional problems and that he was depressed for only a few minutes at a time. Dr. Ruth noted that the claimant's speech was relevant and well-directed and that he was fully oriented. Dr. Ruth diagnosed the claimant as suffering from an adjustment disorder. Dr. Ruth also conducted a medical assessment of the claimant's ability to perform work-related activities. On the basis of this assessment, Dr. Ruth concluded that the claimant had a very good ability to follow complex job instructions, and exhibited a high ability to relate to co-workers, deal with the public, interact with supervisors, handle work-related stresses, behave in an emotionally stable manner, relate predictably in social circumstances, and demonstrate reliability.
 
 
 10
 Lastly, psychologist Dr. Marx also examined the claimant in April, 1986. Dr. Marx administered an MMPI which revealed that the claimant suffered from significant depression. She noted that the claimant was depressed, forgetful, and occasionally disoriented. Dr. Marx also interviewed the claimant's wife. Galvan's wife described him as having mood swings. She also stated that he was nervous in crowds, was a poor sleeper, and tended to be forgetful. Based upon the MMPI and information gathered during the interview, Dr. Marx concluded that the claimant suffered from underlying depression and an overriding concern about his health and physical functions and, therefore, was unable to engage in any type of substantial gainful employment.
 
 II.
 
 11
 The issue presented upon appeal is whether the Secretary's final decision that the claimant was not entitled to either DIB or SSI was supported by substantial evidence. The Social Security Act provides that an applicant for DIB must establish an inability to engage in any substantial gainful activities by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted, or which can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. Sec. 423(d)(1)(A). A claimant is unable to engage in any substantial gainful activity only if his physical and/or mental impairments are of such severity that he is not only unable to do his previous work, but also cannot engage in any gainful employment in the national economy. 20 C.F.R. Sec. 404.1520(a)-(f). Additionally, to qualify for DIB, the claimant must establish the onset of a disability prior to the expiration of his insured status. See Garner v. Heckler, 745 F.2d 383 (6th Cir.1984); Gibson v. Secretary of Health, Education & Welfare, 678 F.2d 653 (6th Cir.1982). In the instant case, the claimant's insured status expired on September 30, 1978.[1] Therefore, it was incumbent upon the claimant to establish that he was disabled on, or prior to, September 30, 1978, to be entitled to DIB. Unlike a claim for DIB, insured status is not a requirement for SSI. See, e.g., Garner, 745 F.2d 383.
 
 
 12
 Upon its initial determination, the Secretary concluded that the claimant was capable of working, despite his physical limitations, as of September, 1978. In accordance with the district court's directions on remand, the Secretary considered additional evidence of the effect of the claimant's emotional and psychological impairments upon his ability to work. Based upon reports authored by a psychiatrist, Dr. Ruth, and clinical psychologists, Mary Allen and Dr. Grenthner, the Secretary concluded that Galvan's emotional and psychological condition in no way limited his ability to work as of September 30, 1978. Accordingly, the Secretary denied the claimant DIB. Additionally, based upon reports of a neurosurgeon, Dr. Angelucci, and a consultative orthopedic surgeon, Dr. Sajadi, and given the fact that claimant worked on a part-time basis and had received no medical treatment since 1978 for his hip injury and allegedly disabling pain, and had never received any treatment for any psychological impairments, the Secretary denied the claimant SSI.
 
 
 13
 On appeal, the claimant argues that the Secretary erred in not considering properly the claimant's subjective complaints and the medical objective evidence of severe disabling pain. Prior to 1984, this court held that subjective complaints of pain alone were sufficient to support a disability claim. Beavers v. Secretary of Health, Education & Welfare, 577 F.2d 383 (6th Cir.1978). However, when Congress enacted the Social Security Disability Benefit Reform Act of 1984, Pub.L. 98-460, 98 Stat. 1794, it established a new statutory standard for evaluating subjective complaints of disabling pain. The Secretary's regulation now provides that subjective allegations of symptoms, including pain, cannot alone support a finding of disability. 20 C.F.R. Sec. 404.1529. In Duncan v. Secretary of Health & Human Services, 801 F.2d 847 (6th Cir.1986), we affirmed the new statutory standard and articulated a two-prong analysis to evaluate subjective symptomatology. We stated that there must be evidence of an underlying medical condition and (1) there must be objective medical evidence to confirm the severity of the alleged pain arising from that condition, or (2) the objectively determined medical condition must be of a severity which can reasonably be expected to give rise to the alleged pain. However, the standard does not require objective evidence of the pain itself. Duncan, 801 F.2d at 853; see also, Foster v. Heckler, 780 F.2d 1125 (4th Cir.1986); Green v. Schweiker, 749 F.2d 1066 (3d Cir.1984). In the instant case, the Secretary concluded that while Galvan produced objective medical evidence of a severe hip injury, in accordance with the first prong of the Duncan test, he failed to produce sufficient objective medical evidence corroborating his allegations of disabling pain. Additionally, the Secretary concluded that the claimant greatly exaggerated his symptomatology.
 
 
 14
 The determination of disability based on pain depends largely upon the credibility of the claimant. Houston v. Secretary of Health & Human Services, 736 F.2d 365 (6th Cir.1984). Since the Secretary has the opportunity to observe demeanor and to determine claimant's credibility, his observations should not be discarded lightly. However, the Secretary is not permitted to discredit a claimant's testimony solely on observations made at the hearing. Rather, the Secretary must cite some other reasons for his conclusion. Weaver v. Secretary of Health & Human Services, 722 F.2d 310 (6th Cir.1983).
 
 
 15
 In the instant case, the Secretary articulated reasons beyond his observations at the hearing for discrediting Galvan's allegations of disabling pain. The Secretary stated that review of the entire record, including the entirety of the physical, psychiatric, and psychological tests, the claimant's failure to seek regular medical treatment since 1978, the relative weak potency of the over-the-counter drugs the claimant used for pain and his admitted daily activities, were inconsistent with his assertions of debilitating pain. The objective medical evidence established that the claimant suffered from a severe hip injury. However, subsequent examination by Drs. Angelucci and Sajadi revealed that the claimant's condition greatly improved and that he retained a full range of motion of all of his joints. While Dr. Morgan diagnosed the claimant as suffering from degenerative arthritis and aseptic necrosis, and Dr. Hunter diagnosed the claimant as suffering from a herniated intervertebral disc, neither doctor could provide an objective medical basis to substantiate the claimant's allegations of disabling pain.
 
 
 16
 Galvan argues that the testimony of his treating physicians, Drs. Morgan and Hunter, should have been given complete deference. Although it has been held that the medical opinions and diagnosis of treating physicians are accorded substantial deference over opinions of other physicians treating the claimant on one occasion, there is no mechanical rule insulating a treating physician's diagnosis. See Harris v. Heckler, 756 F.2d 431 (6th Cir.1985). Indeed, a treating physician's opinions are accorded deference only if the physician provides sufficient medical evidence to substantiate the diagnosis. Houston v. Secretary of Health & Human Services, 736 F.2d 365 (6th Cir.1984). Under these circumstances, it is well within the Secretary's province to credit one medical opinion over another, or to examine other relevant facts and circumstances. As we previously noted, Drs. Morgan and Hunter were unable to substantiate the basis for Galvan's debilitating pain. On the other hand, the consultative examinations performed by Drs. Angelucci and Sajadi, which included x-rays, thorough range of motion studies, and neurological examinations, revealed no significant limitations on claimant's exertional capacity and identified no objective medical evidence to substantiate claimant's complaints of pain. To the extent that there were conflicts in medical evidence, it was the duty of the Secretary to weigh and resolve those conflicts. The Secretary's decision to rely upon the opinions of Drs. Angelucci and Sajadi was supported by substantial evidence. While there may be evidence in the record to support the claimant's position, this court may not displace the Secretary's decision merely because the conflicts in the evidence could be resolved differently.
 
 
 17
 The claimant also argues that the Secretary failed to consider the combined effects of his impairments on his ability to work. The claimant first specifically asserts that the Secretary failed to take into consideration his lack of vocational training, his limited work history, and his advanced age. However, since the Secretary determined that the claimant was able to perform his prior job as a cook, he did not need to consider these additional factors. It is only after the claimant satisfies his initial burden of proving that he is unable to perform his prior job, that the Secretary considers the factors of age, education, and past-work experience. 42 U.S.C. Sec. 423(d)(2)(A); Young v. Califano, 633 F.2d 469 (6th Cir.1980).
 
 
 18
 The claimant next specifically asserts that the Secretary failed to consider his serious mental impairments in conjunction with his physical impairments. The evidence of record concerning the claimant's psychological condition consists of four psychiatric and psychological evaluations. Two of these evaluations, which were performed by Mary Allen and Dr. Grenthner, and Dr. Ruth, concluded that the claimant experienced no significant emotional or mental impairments. Although the evaluations of Drs. Gebrow and Marx revealed the presence of varying degrees of depression, only Dr. Marx felt that the claimant was unable to work due to its depression. Given the conflict in the evidence concerning the claimant's emotional condition, the Secretary discharged his duty to weigh and resolve the evidence. The Secretary concluded that the claimant's only medically determinable mental impairments were adjustment disorder and borderline intelligence. The Secretary found that, despite these limited impairments, the claimant experienced no functional limitations that would have precluded him at any time from resuming his prior job as a cook. The Secretary's conclusion that there was no substantiation for a diagnosis of severe depression of disabling severity is consistent with the claimant's constant denial of any psychiatric problems and his failure to seek any treatment. While three out of the four psychiatric and psychological examinations were conducted eight years after the expiration of Galvan's disability insured status, the Secretary's election to rely upon the reports of Dr. Ruth, Ms. Allen, and Dr. Grenthner cannot be faulted in light of the fact that claimant failed to seek any treatment whatsoever for his alleged mental and emotional impairments in the interim.
 
 
 19
 Finding that the Secretary's decision was based upon substantial evidence, we AFFIRM his decision denying claimant Disability Insurance Benefits and Supplemental Security Income.
 
 
 
 [1]
 During the hearing before the administrative law judge in January, 1986, the claimant presented current earning records showing that he reported earnings in 1979 and 1980 which would have extended his insured status for disability purposes through June 30, 1983. However, the claimant's attorney stated that the claimant actually had not worked either of these years and that the earnings he allegedly reported were in actuality earnings of his wife. The claimant's tax preparer provided an affidavit that the claimant, in fact, did not report any earnings in either year and that the $1,600, which supposedly had been attributed to the claimant, had been reported under the Farm Optional Method on Schedule SE. Since the claimant did not earn any income during these years, his disability insured status expired on September 30, 1978, rather than on June 30, 1983